Good afternoon, Your Honors. Go ahead. Thank you. My name is Brooks Harlow. I represent the appellants who were plaintiffs below. I would like to preserve five minutes of my time for rebuttal. This case comes before the court on review of dismissal under Civil Rule 12b-6. Accordingly, all facts pleaded in the complaint are taken as true. Hold on one second, sir. Could you please space these, start the clock for me? You did have to remind her of that. It's not that we wouldn't like to hear you argue all day. You've had a long morning slash afternoon. We're glad we took a break. Sorry we inconvenienced you. But now I think we can pay attention. Well, you've been working hard. You've just been sitting around relaxing. At any event, under 12b-6, all facts pleaded in the complaint are taken as true, and all reasonable inferences must be drawn in favor of the plaintiffs. The dismissal should be affirmed only if it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts that could be proved. So let's look at the complaint. The plaintiffs allege that Quest discriminated against them from 1997 to 2002. Quest did this by charging itself one rate, but charging the plaintiffs higher rates based on preemptive state tariffs. That's what puzzles me about this case. How do we know what the lawful NST rates were in the particular states involved during the relevant period? We know that the lawful rate – we know what the lawful rates are because of what Quest filed in 2002, which was the first time they ever filed anything in compliance with a new services test. Well, we don't know that. We don't know that the rates filed during the interim from 1997 until 2002 were not, in part at least, NST compliant. We don't know that. We do, Your Honor, and the reason is the NST compliance, new services test compliance, requires not only that the number be right, but it requires that the state review the number and affirm it's right. And the state has to review that by Quest filing cost studies. And by Quest filing either proposed tariffs or saying, look, here are our cost studies, and these cost studies support our old tariffs. So did they not file in certain states cost studies? They filed – Quest filed in three states, Your Honor, Arizona, Montana, and Oregon. And those three states are not included in our lawsuit. So your lawsuit focuses on states in which they did not file new tariffs and cost studies? In which they didn't file either tariffs or cost studies. So perhaps the case should be deferred until those cost studies have been filed and the rates have been determined. The Quest – the cost studies and the rates were filed in 2002, and that's what revealed the discrimination. When it became apparent from the filings, the rates were in some cases less than half what the rates had been for the five-year period during which Quest had discriminated against the plaintiffs. Well, the other thing that troubles me is the interpretation of the order, whether it necessarily entitles you to reimbursement for the period up until 2002 or for a lesser period. And that's a question of the intent of the FCC. Don't we have to have the FCC's interpretation? Your Honor, we submit that there is nothing that needs to be referred to the FCC. And the reason is the FCC has engaged in interpretation not once but a number of times. There's the September 1996 order. There's the November 1996 order, which we refer to in the briefs as the cost-based order. There's the refund order itself, and then there's the Wisconsin order in 2002. But there's a waiver order. The waiver order we call the refund order. I think that you're right. But none of those orders dealt with the question that Judge Schwarzer asks, which is, for what period is a refund available? I mean, you would construe it as saying that, but they were not – did not actually address that question directly. We would construe it, they did not address that question directly. Quest makes much of the fact that it's a limited waiver, and the FCC did use that term in the refund order a half a dozen or maybe a dozen times. But you need to look more closely. I understand that there's a very good argument that the orders mean exactly what you say they mean. But the observation of the FCC hasn't said that is correct. The – we have two arguments. Number one, the FCC expressly in the refund order left the refund period open to end it. The limitation on the order was the limitation on Quest's ability to violate Section 276. You may well be right, but the question is, has the FCC ever said that? The FCC has not said that. We posit to the Court the FCC cannot say that. And the reason the FCC cannot say that is because of Section 276, which is the basis for their refund order to begin with. Because Congress prohibited discrimination against the plaintiffs by Quest from April 15th, 1997. At that point, it became unlawful for Quest to discriminate. And the FCC could not excuse that. And they knew that. And that's why, when Quest went to them and said, we need a waiver, we need another 45 days, they said, okay, but we're only giving it to you if you agree to pay – or because you agree to pay a refund retroactive to April 15th, 1997. But they were able – you can see they had the power to give the waiver on April 15th to May 15th, or whatever the period was. So if they had the power to grant the waiver for a limited period of time, they could have granted it for a longer period of time. They could have probably granted for a longer period of time, but then – We don't know. Pardon? We don't know whether that's what they intended. I'm almost certain the FCC intended that Quest would comply with its order by May 19th of 1997. But they never did grant a waiver of having to pay the money – of having to effectively charge those rates by refunding anything later. That's your basic argument. Right. So it wasn't a waiver of paying the statutorily required – of charging the statutorily required rate. It was only a waiver of when the tariff would go into effect, whether it would go into effect retroactively or prospectively. But what – so – but the fact still remains that the FCC has not directly determined this. The papers suggest – indicate that there was some filing in the FCC about a year ago, which looks like it might have generated an interpretation. What's happened to that? This is not in the record, of course. I understand. But I do have some awareness, and I'd be happy to share my knowledge with the Court. I actually met with the FCC about a month ago. I met with one of the commissioners, Commissioner Abernathy. I met with the staff, the deputy chief in charge of the Wireline Bureau, which would make this decision. And essentially, that case is not going anywhere. Commissioner Abernathy told me – It's filed and it hasn't been – but the official posture, you filed it or someone filed it. You filed it or someone filed it? No, we did not file it. But somebody filed it, and it simply has not – it's a discretionary proceeding, and it hasn't been proceeded. That's right. Is that the short answer? Yes. And the deputy chief of the Wireline Bureau was very blunt. She told me in no uncertain terms – she said, we don't have the resources to work on this unless and until the chairman tells us to work on it. And that directive hasn't been – And the next question is – and this is a little baffling to me. The – you say in your 20HA letter that several State agencies have now reached this question, interpreted – as I understand it, interpreted the waiver in the way that you're suggesting, and issued refund orders for a five-or-so-year period. Why isn't that your remedy? Why don't you just go to the rest of the State agencies and get them to do the same thing? The reason for that is that in those other States, the Bell Companies, Quest's equivalent in those States, made filings. And that enabled those State commissions to make the review that they're supposed to do and then determine to apply refunds in the cases where the rates went down. Another aspect of your question – Is what you're saying is that in the other States they haven't made post-2002 filings? In the other – I mean, every State is different, but in some cases the filings were made after 2002. In some cases the filings were made within the waiver period, within the – before May 19th of 1997. But the cases dragged on and refunds were paid many, many years later. But, I mean, the real answer to your question as to why don't we do that, the reason is that we have a Federal right of action, and it's an election of remedies. Section 276 has been violated. We allege there was discrimination, which means they charged us a different rate, not an unreasonable rate. And Section 207 expressly says that a violation of Section 276 allows a person damaged to come to Federal court and seek redress of those damages. So we've been given specific right of action in the Federal courts. So if – Go ahead. After you. All I was going to say was this. You've structured a lawsuit on certain assumptions, which may allow us to possibly avoid filed tariff problems or primary jurisdictional problems, but they're very constricting. And your assumption being, as I understand it, that they had to – we would have to find that they were required to file cost filings, right, cost statements, or were required to file new – make new filings during a certain period rather than rely on the ones they had already made. So we might be able to structure from your complaint a lawsuit that would not be within the primary jurisdiction of the FCC, but it would mean, for example, that we – if we decided that the reasonableness of – that the compliance during the 97-2002 period was relevant, then the lawsuit would go away, and we'd have to say we can't do that. I mean, is that basically the way you're presenting the case, that we take the case the way you presented it, and if we agree with your legal determinations, we go forward, and if not, the case goes away? On 12b-6, we think that's exactly right. You have to look at the complaint and the facts pleaded and granting all inferences. You can't grant any inferences. I'm not sure of the facts. Some of them aren't facts, but they're at least a legal theory. Well, the legal theory is that Quest, as a matter of fact, discriminated against us, and that fact is based on our ability to show, as a matter of fact, that Quest charged themselves a different rate for their access line service than they charged the plaintiffs. Okay? But we have to litigate that, or the courts do, for the 97-2002 period. We have to litigate whether they – what rights they actually charged and whether those rates were proper or improper rates. That seems to me to – to have severe problems with regard to primary jurisdiction and possibly filed rate tariff documents. My understanding is that your threat tells us we don't need to do that. Well, Quest has set up a defense. Basically, Quest is creating this defense, kind of, I think what you're saying is don't – doesn't the court have to engage in rate-making in a retroactive aspect? Right. And the answer is no. I mean, if you allow that argument, you're allowing Quest by failing to file in 97 or in 98 or 99. So what – and no, because on your theory of what they were obligated to do, they were obligated to file a piece of paper saying this is our new rate under the new standards, and here's our cost support for it. And unless and until they did that in each and every State, it didn't matter what  So we have to look at that rate to see if it was compliant. Right. Is that your theory? Right. You only need to look at that rate to calculate what the damages are, because that rate, the preempted rate is the one that establishes how much you actually paid. All right. But if we thought, for example, that no, they didn't need to do that, they could have simply gone to – they could have – they had rates on files with the – on file with the States, and those rates may themselves have been compliant, and so we would have to go look at the rates that were on file. And that we can't do, then you would lose. I mean, I'm not saying you should win or lose. I'm saying that that's the parameters that you're setting up, essentially. Right. Right. Quest filing in 2002 is an admission by Quest. They're the ones who went to the State commissions for the first time ever and said, these rates comply with the new services test. So let them contend to the State – to the district court or to the jury that those rates didn't really comply with the new services test in 97 or 98, that they only complied for that one snapshot in time, 2002. If you assume that the rates were different in 97, 98, and 99, you're granting an inference to Quest. And you can't do that under the standard here, under 12b-6. So I want to address a point. It's not in my argument, but you mentioned it. The argument that Quest didn't have to – I think this kind of goes to the heart of one of your questions – that Quest could basically internalize and determine whether they complied rather than filing with the States. It's just not true. If you look at the cost-based order, paragraph 163, which is excerpt for record 83, the FCC said, we require LECs to file tariffs in the intrastate jurisdiction. And then States must apply these requirements. And then we will rely on the States. And then States may, after considering the requirements of this order, approve the existing tariffs. Nowhere in there is there an exception that says the States don't have to do that. In the refund order, the FCC said, the requisite cost support data must be submitted to the individual States. And then, because the LECs are required to file and the States are required to review intrastate tariffs, and then the States' review of intrastate tariffs will ensure compliance with new services test. It's abundantly clear, and you don't need to refer this to the FCC to find out whether Quest should have filed something in 1997. They should have. Instead, what they did was they fought application in their services test. And even if they had self-certified, it's obvious from the arguments they made in Wisconsin and then on appeal to the D.C. Circuit in the New England case, it's obvious they were applying the wrong test in making that self-certification. So. Let me ask you something. Is your claim based on the waiver order, the refund reimbursement provision to the waiver order, or is it based on some statutory provision against discrimination? That's a good question. And the answer is both. And if you look at our complaint, we plead both the refund order as well as Sections 207 and 276, and we plead that we are discriminated against. The reason that they're very kind of the same thing is because the refund order only exists and says what it says, and it only should be interpreted the way we interpret it because of what Section 276 says. Well, excuse me. But 276 was a 1996 amendment, is that what it was? That's correct. 276A2, I believe it is, that prohibits discrimination. Was that claim subject to the statute of limitations? I'm sorry. The 276 claim, would it be subject to the statute of limitations? 276 would be subject to the statute of limitations under Section 415. So it would be limited to, what, three years? It's a two-year statute, and it's a discovery rule, Your Honor. And every circuit agrees and Quest agrees it's a discovery rule. This circuit in the Pavlik case, I believe it is, indicates that discovery is uniquely a question of fact. And the reason we couldn't discover the damage, which is an essential element. You don't have a damage claim until you have damage. The reason we couldn't discover that until 2002 is because Quest didn't make the filings. They knew what their costs were. They knew the discriminatory rate they were giving themselves, and they didn't tell us because they didn't make the filings. But if your contention, your legal contention is that they were required to file either a new tariff or a cost-based support for the existing tariffs, and they didn't do it, that occurred in 1997, no? That's right. So what is your – what's that you discovered right away? Well, there are a lot of hypothetical claims we could bring, but we could not bring a damage claim under Section 207, because Section 207 says a person who has been damaged by a violation of this chapter. And until 2002, we couldn't know. Quest themselves – and this is excerpt from Record 115. Quest's own lawyer says to the FCC, in some cases, this is in requesting the waiver, in some cases the rates may have to go up. How can the plaintiff be charged with knowledge that they had been damaged and that Quest was charging itself a lower rate when Quest itself is telling the FCC the rates might go up, they might go down? We don't know yet. What is it about the 2002 Wisconsin order that gave you notice of the claim? Quest's arguments about how to interpret – first of all, Quest was arguing that the new services test doesn't even apply to intrastate rates. And, you know, the FCC dispensed with that. But they were also arguing – basically they were arguing we can set whatever rate we want, and that was their basis for self-certification. And the FCC says, no, you can't set whatever rate you want. It needs to be cost-based, and you need to file the cost with the states and establish that. And boom, when that happened, Quest knew there was no more wiggle room. They knew they had to comply with 276. They knew they had to make filings, and they did so. And in all 11 states, the rates tumbled. And that's when we knew we had been severely damaged for the last five years. Now, wait a minute. That's very complicated. You just said in all 11 states the rates tumbled. But then you had earlier said, I thought they didn't file except in most of the states. They filed in 2002. Right. We knew what we'd been paying for five years. So now I'm back to my other question. If they filed in 2002, why aren't you getting a remedy from the State agencies on exactly what you're asking for here? We're not doing that because we have a statutory right of action. I see. So you haven't asked for it in those agencies. Right. Right. It's much more efficient to bring it in one. I see. Okay. It's not because you've asked and been denied. You just haven't asked for it. It's a matter of efficiency. I mean, this is an industry that's withering and dying. Have you lost this issue anyplace? The issue, refunds were granted in Arizona. The issue is still pending in Oregon. And it hasn't come up in Montana. So it's a permissive election of remedies. You can pursue your Federal statutory claim. Well, if you really want to drill down, I think there's some serious questions as to whether or not the states could enforce the FCC's order. A lot of states have. But you could run into problems. Whereas we have a clear remedy here because there's been a violation, 276. Just to be really clear. You said Arizona, Montana, and somewhere, Oregon, were places where they filed tariffs and cost studies during the 1997 to 2002 period or after 2002? Montana, I think it was filed during the 45 days in Arizona. I'm not sure. I wasn't counsel there. And then you said later that the rates had come down in all 11 states, which I take it means that they did file after 2002 in all 11 states? Actually, they filed in all 14 states. They did, in all 14 states. All of our 11. So what hasn't happened? So now in all of those states, you have a – you do have a 2002 new rate? That's right. In all of the relevant states? All of the 11 states that are subject to this lawsuit. Okay. But what you don't have – so why did you mention Arizona, Montana, and Oregon especially? Because there it was filed before 2002? There we had, you know, actions by the State commissions that arguably would create preclusive effect. Because there was a refund issue. Because there were filings. Because the quest teed up the issue in those three states. Teed up which issue? I'm just trying to understand. Teed up the – teed up the question of whether the rates complied with the new services test. But you said they've done that in all the states now. I realize it's confusing. It is confusing. They did so in 2002 as to the 11 states that we're suing for. They did so much earlier in the other three states. Either in 97 or very close to that time. The damage claim is based on the fact that the rates went down after the 2002 filing. Is it based on the assumption that the rates would have been at that lower level during the period 1997 to 2002? I wouldn't call it an assumption. I would call it a fact that how could it be taken as true. And Quest may challenge that at trial. But this is an issue to go before the jury. If that's your theory, I think you've got a problem. I thought you had a different theory. And I thought your theory was that under the order, they – unless and until they actually file a compliant rate, that is what the refund is supposed to be based on under the order. And you're not supposed to look back to the period before it to see why there might have been otherwise. In other words, your theory is until they file a rate, which is an approved rate, they don't get to reconsider the time period before that, and the refund has to be based on that rate, which we can either agree with or disagree with. But that's what I understand your theory to be. Well, I think you've stated that correctly, and I may have misunderstood Judge Schwarzer's question. So it's not that they can defend at trial on that theory on the ground that they should have – that their actual costs during 1997 to 2002 were less. It's that you are going to legally live or die on that theory. If that theory is wrong, you lose. I don't think necessarily. I think that's the easiest theory to pursue, because we do think that the Federal courts should interpret the FCC refund order that way. But there is also the direct claim under Section 276 and 207 for damages. And under that theory, I think we'll present to the jury, look, this is our measure of damages, the rate that we were charged minus the rate that was filed in 2002. Then it's up to Quest to raise a defense and say, well, wait a minute, you know, that might not be accurate. But, I mean, the difference isn't the basis of the claim. It's the measure of the damages. But it might be a difference that turns the filed rate doctrine primary jurisdiction issues in a different direction if the jury or the court is going to have to decide anything about the proper rate for a five-year period. See, that's the trap that Quest tries to get you into. But you're saying that might happen. As you're presenting the dynamic at trial, you're saying that that may in fact occur. Well, I mean, Quest might try to do that. But that's a question of fact, again, for the trier of fact. That does not create a defense of primary jurisdiction or the filed rate doctrine. They can't allow their own, the fact that they didn't comply for five years rather than in 45 days like they were ordered to do, they can't allow that to create a defense to a damage claim. When Congress expressly said you need to stop discriminating on April 15, 1997, if they didn't do that and we can prove that they charged themselves a different rate, which we think we can, then the jury can award damages. Would you like to reserve some rebuttal time? Yes, Your Honor. Mr. Harlow, sure, that's fine. Thank you, Your Honor. Okay. Now we have Mr. Vogel. Thank you, Your Honors. My name is David Vogel, and let me start with a couple of fundamental assumptions that you've heard my colleague make that are, I think, completely flawed. The first one is the assumption that because Quest didn't file anything, they were in violation of the FCC orders. The specific issue was put to you. Well, isn't that the question, not the answer? I mean, right now, as I understand it, we're dealing with a primary jury. We're dealing with a question of whether the court has jurisdiction in a primary jury. Is that right? Well, I think the way they try and avoid the question you're putting, they walk themselves into a statute of limitations problem, a severe one, which you all were touching on. That is, their defense today is, well, their argument today is, well, because Quest didn't file cost studies when they were required to, therefore, they were in violation of the NST and we couldn't know. Well, you could be right about that. That may be. So we have two problems before us. We have a jurisdiction problem. We have a limitations period problem. But the problem we don't have, as I see it, is the main argument that I understood Quest was making, which is that and the issue on which the district court went off, which is that there's a filed rape doctrine primary jurisdiction problem here. I don't know about primary jurisdiction, but at least filed rape doctrine. Well, no, I think there absolutely is, and that's the second issue that I want to raise, which is that they have taken this act of filings in 2002 as their allegation is that's the first time that NST compliant rapes were filed. What you have to look at chronologically is that those filings Quest made and in the NEPCC case that was cited in the briefs were also made simultaneously by Verizon and SPC and others. These new filings in 2002 occurred as a result of the FCC's Wisconsin order in 2002. And what the FCC's 2002 order did was it removed one of the cost elements from the basis of the rape. The FCC in the 2002 order went through several things, ones like the CCL rate and ones of subscriber line rate and the PIC charge. And they went through these different ones. And the FCC said, well, certain ones you can keep as part of your rape. Oh, but this one, this one you can't charge in your rape. You've got to exclude these costs. And that was the first time any of the RBOCs knew that. And as a result, the RBOCs went to the D.C. Circuit and tried to get that order reversed. The D.C. Circuit upheld it. In making its opinion, the D.C. Circuit said that this is a rule, not just a, this is a rule of nationwide effect. It's a new rule. And that was in the question of whether the RBOCs had standing to challenge the rule. But in making that decision, the first, or the D.C. Circuit was saying that this is a new rule, a new test, a change that's going to affect the RBOCs because they're going to have to change their tariffs. So the new tariffs that came into effect in 2002. Okay. But let me just ask you. So that's your theory. We have, do we have jurisdiction to decide whether you're right or wrong on that theory? Isn't that, in other words, if you're right on that, if you're wrong on that theory, then why can't the case go ahead? Why couldn't we decide whether you're right or wrong? And if we thought you were wrong about that, why couldn't this case go forward? Well, because you still, at the end of the day, are going to have to decide what the delta and the rates should be. And that's what I'm asking. If we bought their theory entirely. I mean, my posit here is that there may be a very narrow case set up the way they're trying to set up that we can adjudicate. And they may lose because it may be so narrow that there is, it will fall off a legal train as it goes along. But that if we bought that there had to be filings, and if we bought that the 2002 was not a new order, and if we bought that we could therefore, and if we bought that the agreement, that the waiver did go all the way forward, and if we bought that the 2002 rates were the first legitimate rates and that they went all the way back to 97, then why couldn't the case go forward? Okay. You are, you have exactly duplicated the same list of ifs that I myself have been mapping out in preparation for the oral argument. Okay. That there, if you ignore the 97 refund or waiver order for the moment, let's not worry about it. Put that aside for a second. They came into court and they say these rates from 97 to 02 do not meet the new services test. That alone clearly under all established precedent has to be a question of first instance for the FCC. We're hearing this, the FCC here has said in its discretion it wants that question resolved by the state commissions if possible. Which question, I'm sorry? The question of whether the rates from 97 to 2002 met the new services test. Because that's your typical rate making rate regulation issue. But on their theory, you never address that question, as I understand it. Well, I must say I'm a little unclear about their theory, because between the lower court and then this court, you see. As I understand it at this moment, on their theory, you never address it, because what the order said was that until you have a properly filed and approved rate, that the first properly filed and approved rate becomes the effective rate, and that's the one that you have to base the refund on, and that was after 2002. That is what I understand. And they did waffle about it some, but that's what I understand their basic theory. Well, I think the problem is that that's squarely not what the FCC said, and we cite this in our brief. My question to you is can we decide that? Is there any reason we shouldn't decide that? Well, I think what you can decide there is to reject the notion that there had to be a filing. That is, that as a matter of law, there did not have to be a filing. So essentially, we can take that legal theory and adjudicate it without running into a file tariff or a primary jurisdiction problem. Now, if we reject it, then to go off on another theory, we may run into a primary jurisdiction or file tariff. I think we're on the same page. I think what we're saying here is that you'd have to decide their theory is nothing more than that the 2002 Wisconsin order was retroactive in effect, that the refund order applied to tariffs not just filed within the 45 days. Yeah, I understand the refund might be more than 45 days long, but it applied to more than tariffs filed within the 45 days. It would be any tariff ever filed, and that there, therefore, would be no rate making necessary because you'd just be doing this, quote, unquote. That's what I understand they're presenting to us most of the time. Sometimes there's a little waffle, but most of the time it's not. I think when you actually start with their complaint, you won't see the phrase cost studies anywhere in it. I mean, this was something they kind of invented as they went along the way to try and realize that their initial complaint, if you just read it, it's a straight rate making accusation. The rates didn't comply with the NST. When they realized they had a huge file tariff and primary jurisdiction problem, their later brace started trying to – the first reaction was it's a 407 claim to enforce an order for payment of money. Then they saw that that has a one-year statute of limitations. So in their opening brief to you, the – I see – there is a two-year statute of limitations in the Communications Act. However, if there's an SEC order ordering the payment of money, and that's typically interpreted as in an adjudicatory proceeding that a defendant, like a carrier, is told to pay money to the complainant, the Communications Act describes a different statute of limitations, and that's the enforcement of an order to pay money must be filed within one year of the date of the order and not after. So one of their early theories in this case was to turn it into a 407 case, notwithstanding all the other allegations in the complaint. But if that was true, it had to be filed within one year of the date of the refund order. So obviously they missed that date. So even in their opening brief to you, and our brief points this out, they aren't sure whether or not they're still asserting a Section 407 claim. They kind of waffle on that as well. In fact, outright contradict themselves. In one page they say they are asserting it. In another page they say it doesn't apply here. So I think it's really hard to pin down exactly what their theory is. It seems to change with every phase of the litigation or every change of the briefing. If the claim is going to be limited to nothing more than whether, number one, the refund order applies to tariffs filed later in time, and, number two, whether or not the Wisconsin order is retroactive, those would be. . . And governs the refund. And would therefore govern the refund. And the other thing I want to point out, though, is they, in their supplemental authorities, they pointed out three state actions that ordered refunds. Two of those was the Michigan and Wisconsin expressly said the refund was required by state law. They weren't basing the refund on the waiver order. They were basing the refunds under state reparations law. The third one they cited was the Alabama PSC, which was like a one-paragraph decision that didn't explain itself, just ordered a refund. And other state actions they had cited in their reply brief also cited state reparations law as grounds for a refund. So the fact that some courts have been ordering refunds doesn't mean that this is necessarily the refund order. But they've been ordering it based on the 2002 rates all the way back. Is that what they've been doing? I think some of them did. I think even Michigan won, went back and looked at both SBC and Verizon tariffs, or I guess today it's now AT&T tariffs, and actually held some of them did meet the new services test. So are there any rulings that some of the interim rates met the new services state? Well, in fact, the Colorado PUC, the Colorado Commission, did review some of these very quest-terraced issues. Some of them it found overstated in order to refund. Some of them it found didn't meet the test. Now, that ruling, I think, was in 99 for the Wisconsin order in 2002. That ruling may have a preclusive effect to some extent. So you're saying that they found that they didn't meet the test. Has any state agency found that any of the rates before 2002 met the test? Did meet the test? I think the Colorado Commission did. And we cited some of the others. There's been a dispute between the parties as to what the commissions did or didn't do. I think the plaintiffs would have to concede if a state commission found it met the test, that that even said that would be preclusive. And if you didn't appeal that order through the appropriate state channels for appealing it or go to the FCC with it, then filing in the federal court here is not going to be effective for challenging that order. So I think to the extent that this case can only deal with states that haven't conclusively ruled that the quest services didn't meet the new services or the quest rates didn't meet the new services test. I think the reason that the narrow scope of this case that you're posturing now, if you go back to the original complaint and just read it through, it's the first few pages of the record, you're not going to see this theory in there. Yeah, they referenced the refund order and they never mentioned the Wisconsin order. You know, that it's really, you know, you could pull it out of a couple sentences of the complaint in parts, but not in whole, and it's really kind of a renewed suspicion about how to look at this. And, you know, it's their effort to try and dodge the obvious implications of the final tariff doctrine. It might advance the ultimate conclusion here as to the dispute to at least get that off the table and if we agree that that's not covered by the – I don't know which way it comes out, but the issue for us right now is there jurisdiction over something that could be adjudicated, it seems to me. Well, I think there's – I think that's true to an extent. I think that the primary jurisdiction doctrine says if there's a threshold issue, a core issue that is reserved for the agency, then the Ninth Circuit law as well as everywhere else has been that that's got to be taken care of first. So what's the threshold issue here? The threshold issue would be whether the 97-2002 rates complied with the new services test. And I'll point you to the complaint, paragraphs 13 and 14 of their complaint, expressly say the 97-2002 rates did not comply with the new services test. That was the allegation in the complaint. And that's – if they're wrong on that, there's no lawsuit. If they complied with the test, there's no lawsuit. Well, it's a threshold issue over whether the order, the refund, the waiver order continues in effect until 2002. Well, I think it's a question of which you want to come first. I mean, I think the threshold – factual question, the core issue is did the rates comply. If you ask yourself first, did the refund order – would it even provide a remedy here, if you conclude no, it wouldn't, then, right, then you'd immediately run into the question that the core factual issue would have to be referred. But I think the second problem is even if you decide that the 97 order would require a refund, you're still going to have to have a question of what the rate would have been or should have been. And that's going to be an issue of, you know, again, the agency's going to have to rule on. Because as he even articulated, they're going to – they apparently don't want Quest to bring the defense that we have to go look at the new services test and measure every rate under it. Like somehow we are, you know, raising this just to raise a primary jurisdiction argument. Like we're doing this, you know, for some kind of strategic purpose. But I think the complaint is saying rates didn't meet the test. Well, to resolve this complaint, you've got to find whether or not the rates did. Well, it could have been saying it didn't meet the test because you didn't file anything and you didn't make a showing that you met the test. Well, then I would – then that's the statute of limitations problem. Then you knew that May 19 – excuse me, May 1997, you knew no cost studies were filed. So you had two years from that date to file a complaint or whether it was in district court or in the FCC. If we – there's a self-certification theory running around. Yeah. Which I'm not sure I understand. Well, this has to do with the other world of pay phone compensation, which you would have heard about in the appeal that was remanded last week. That has to do with the owner of the pay phone getting money for 800-number calls coming out of the phone. And Quest, like all the RBOCs, were at one point major pay phone owners. In fact, the four largest pay phone owners were the phone companies themselves. And they were looking – the FCC orders required long-distance companies, AT&T, MCI, and Sprint, to pay money to the pay phone owner for every 800-number call. And the FCC wanted kind of a carrot-and-stick approach. So they said you, the RBOCs, would not get this compensation from the long-distance companies until you self-certify and you've met our orders regarding the pay phone rates. And that's the self-certification at issue. Quest and all the other companies self-certified at some point when they felt that they had complied with the – But isn't that the same – is that not the same rate we're talking about here? It's – the rates that Quest would have been – U.S. West would have been self-certifying, yes, were these – It's the same new rate. We have to show that it was – Well, not the new rate, but that the rate in effect as of the deadline did comply with the new services test. The new services. Let me ask you about the fraud protection rates. Yes. Do they have a separate status from the other rates we're talking about, or are they actually essentially lumped in with all the other rates? Well, I think, Your Honor, it depends on how you characterize what their claim is. If you look at the complaint as drafted, the only allegation made about fraud protection is that it wasn't in a Federal tariff and they were damaged by that period. That alone, standing alone, they would have known in May of 1997. They would have known it wasn't in the Federal tariff. If they thought that alone harmed them, they should have filed a claim. So what they morphed that into is saying, well, when it went into the Federal tariff in 2002, the rate went down, so we were harmed because we should have had a lower rate. Well, at that point, the fraud protection claim is like every other claim in the case. It's just a – it's an argument that the rate in 2002 following the Wisconsin order changed and, therefore, they want damages for it. But if you look at the fraud protection, it's like three sentences total scattered in the original complaint. The fraud protection claim in the complaint doesn't say anything about the rate issue on fraud protection services. It's like a jurisdictional complaint that was in the wrong tariff or not in the right tariff. I see. But if you go back to the self-certification issue for a while, so if you were self-certifying for purposes of collecting, there is somewhere in the world these self-certifications which cover a certain time period. Yes. So you have a concern. Yeah. The self-certifications were filed, I forget, in 97 or 98, somewhere in that time frame. So are you – is that pertinent to our case at all? I don't think so. It's funny. It may just be a full coincidence. A couple of carriers like MCI petitioned at the FCC saying that U.S. West's self-certification is not enough, it hasn't been adjudicated. And the FCC denied that. And I know it's not in this record. It is actually a published FCC order, though. Said, no, all we said was the RBOCs had to issue a self-certification. And once they do that, they're entitled to their compensation. And that's the end of that issue for compensation purposes. They're not saying that they're entitled, that the self-certifications would suffice to set the rate for purposes of this refund order if there is a refund order. Well, no. The self-certification would suffice to require the long-distance companies to start paying Quest. I understand that. Yes. What I'm trying to figure out is if those same self-certifications have any pertinence to our problem in terms of defining the time at which the refund orders might stop because there was an indication of compliance, even if not a reliable one. Well, I think that's a very interesting insight, that that day the self- certification, subject of penalty to the FCC, certifying it believes it was compliant with all the NST requirements and all the FCC requirements for the tariff rates. And that wasn't, I'm trying to remember, maybe Mr. Harlow remembers, I don't remember if the self-certification was actually sent to the FCC or if it was sent to the different long-distance carriers. But there was, that would have been an act that would have been done I think in, I think for U.S. Quest it was probably done somewhere in 1997 because I have a recollection that the FCC action concerning that self-certification was somewhere in 98. But that would be a point in time that Quest was announcing it believed it was in compliance with all the requirements. And I just, for the record, none of the, at least on these allegations, none of these payphone owners here were also IXCs or long-distance carriers. So the compensation Quest was getting from long-distance carriers, these plaintiffs have no standing to be concerned about. That's even put in the briefs that Quest was lying in a self-certification to get these hundreds of millions of dollars in compensation from long-distance companies. I actually know the numbers, it's not hundreds of millions. But these plaintiffs wouldn't have standing to complain about what AT&T might have been paying U.S. West because these companies aren't, these plaintiffs are not long-distance carriers or at least are not alleged themselves to be. So my time is within 30 seconds, so unless there's any more questions, I'll thank you. I think the panel's worth its time. Thank you. You're very welcome. Thank you, Your Honor. So I'll resist the temptation to address all the facts that have gone back and forth. The point is there are a lot of them. Quest has a 10-page counterstatement of facts in their brief. This is a 12b-6 motion. No inferences may be given to Quest. All the facts must be inferred in our favor. But the statement that they were not in compliance has to be a legal statement, not a factual statement. I don't understand how that could be a factual statement. That they were not in compliance with the new services test? I mean, it's a blend of fact and law.  And here the factual allegation is Quest discriminated. Quest charged us a different rate than they charged themselves. And we've got evidence of that in our complaint. Let me just try and address a couple of things. First of all ---- Let me ask a question for just preliminary. How do you prove they're not in compliance with law? Is that with expert testimony? We prove potentially. I mean, there are really a couple of ways we prove it. The best evidence we've got, we think, is Quest's own admissions and the fact that the first time they go to a state commission in the 11 states, they say ---- I don't want to go over all the evidence. What I just want to know is, okay, this was dismissed on your pleadings, right? It was dismissed on our pleadings, yes. But if you have to make proof of that allegation, is it with ---- you're saying it's with admissions? Do you use expert testimony? I would probably think mostly it's not going to be based on experts. Is where this oversteps into the FCC's realm? We haven't had any discovery yet, of course, but I think we're going to prove it out of Quest's own documents. Their filings ---- Let me go back to how much seems like my little obsession here. I thought that you were going to prove it as follows. At least insofar as you have a chance of avoiding the need for us to decide anything about rates, which if you do have to do, we may have major problems. I thought you were going to say they didn't file anything called rates compliant with the new rules, whatever it's called, until 2002. They were approved in 2002 by these various commissions. As we read the order, until that rate is filed and approved, there is no effective rate. That is the effective rate, and all you have to do is subtract. That's what you said in your brief. If you're going to do anything more than that, if you're going to bring in experts and you're going to ask us to make any determinations about whether there was compliance on a cost-based basis with the new requirements, aren't you going to run it? Why aren't you going to run directly into primary jurisdiction, if not the filed rate doctrine? I think that you've – I understand your confusion, I think. It's because we've pleaded in the alternative. And one way that we're going to – we're coming at this in our pleading is it's a simple matter of subtraction under the refund order. All right? And the other thing we've pleaded is that they've discriminated against us and violated the statute. All right. Ask for a second. Why isn't that precluded by the – maybe not the filed rate doctrine, but at least why wouldn't we, applying our primary jurisdiction standards, exercise our right to at least state the action, if not dismiss it? I'm telling you it's out of the FCC. Yeah. Because as to the – as to the damages, we see no reason the jury can't look at the facts that we present after developed, after discovery. Quest's own admission really are the key to that. When they come in and say these rates comply, and they hadn't done that previously, and this gets to the question of whether or not they did have to file something, then really we don't see how equitably they can create a defense that this had to have been done by state commissions when they were the ones that had the charge to do so and failed to do it. That their very thing that they didn't do that we contend caused the violation of 276 somehow creates a defense for them. So I would – if I can have just another minute, I would like to try and ramp up and address a couple things very quickly. The argument that Quest makes that the FCC changed the law and caught them by surprise in 2002, you know, this is ultimately the heart of Quest's defense, and the Court should drive a stake in it right now, we think. The FCC explicitly rejected this very argument in 2002 when Quest made it in the Wisconsin case. And I quote, this is an excerpt from Record 211, the coalition claims that the Bureau order is a legislative rule that must go through notice and comment. We disagree. The Bureau order simply applies our existing authority. The law did not change in 2002. What changed was Quest finally had exhausted their efforts to avoid the law. Secondly, just briefly on the statute of limitations, Section 207 of the Communications Act says, any person claiming to be damaged by any common carrier may bring suit for the recovery of damages. Just because Quest violated the law by not making the required filings didn't mean anybody was damaged. What could have been done in 1997 was the FCC could have brought an enforcement action, which they chose not to do directly. I mean, ultimately they got at them through the Wisconsin order. But there was no evidence of damage until 2002 when Quest lowered the rates. And then finally on primary jurisdiction. I mean, you didn't know you were damaged. That's exactly right. That's not the same as no evidence of damage. In 2020 hindsight, the damage was severe, but we didn't know we were damaged until 2002. Finally, on primary jurisdiction, if you feel like you have to refer something to the FCC, we've been waiting eight years to end this discrimination. And, you know, please refer it directly. We've cited cases in our briefs that you can do that. I've worked with the FCC. They may never get around to it, but they're much more likely to do it if this Court refers it and gives them a deadline. And that's the process that we believe should be followed if the Court disagrees with our position that the FCC has already spoken. Unless there are further questions, I'm concluded. Thank you, Mr. Harlow. Thank you, Your Honors. We thank Mr. Harlow and Mr. Vogel. The DeVal Communications case is submitted. Thanks again.
judges: Gould, Berzon, Schwarzer